# Letcher County Fiscal Court, et al. v. State Tax Commission, et al.

(Decided December 4, 1925.)

## Appeal from Franklin Circuit Court.

1. Taxation—Under Facts, 5 Per Cent. Increase Placed by State Tax Commission on Coal Lands Held Not to Raise Value Beyond Fair Market Value.—Raise by state tax commission of 5 per cent. of values placed on coal lands owned in fee held not to raise their value beyond fair market value nor beyond a value equalized with the assessment values of other coal properties; fair market value being determined by consideration of economic conditions and not wholly on a "present worth" basis.

2. Taxation—5 Per Cent. Increase on Surface Lands, Timber and Improvements Held Not to Raise Value Beyond Market Value.— A 5 per cent. increase in values of surface lands and timber and improvements in Letcher county by state tax commission, making average of not more than $10.50 an acre, held not to raise value of properties beyond their fair market value.

3. Taxation 15 Per Cent Increase by State Tax Commission on Tangible Personal Property Held Harmless in View of Exemptions.—A 15 per cent. increase by state tax commission of valuation of tangible personal property, though raising the market value of household furniture beyond its reasonable market value, held harmless in view of exemptions.

4. Taxation—Increase by State Tax Commission on Merchandise Held Not Shown to Raise Value Beyond "Fair Market Value."—Raises made by state tax commission in valuation of merchandise are not shown to raise value beyond "fair market value," by testimony based on market price of merchandise at a forced sale, as statutory standard of a fair market value has in mind a sale and purchase when one is not compelled to purchase or sell.

5. Taxation—Assessment Raise by State Tax Commission Held Equalized with that of Other Counties of State, and Particularly with those of Like Character.—On appeal by county from raise made by state tax commission held that increase equalized the assessment with that of other counties of state as far as was possible, and particularly with those counties like it in character.

O'REAR, FOWLER & WALLACE and ROBT. BLAIR, County-Attorney, for appellant.

FRANK E. DAUGHERTY, Attorney General, and RAINEY T. WELLS for appellees.

Opinion of the Court by Judge Dietzman—Affirming.

This case involves the assessment of the property of Letcher county as of July 1, 1924, for 1925 state and

county taxes. The total assessment as of that date made by the county tax commissioner came to $14,787,962.00. This assessment was raised by the board of supervisors of Letcher county to $16,761,226.00. The state tax commission sitting as a board of equalization and assessment in order to equalize, as they say, the assessment of the property of Letcher county, and the different classes thereof, as finally determined and certified by the board of supervisors, made the following raises:

(a)  Lands, coal, timber and improvements owned in fee, 5 per cent.

(b)  Coal leases and improvements, 10 per cent.

(c)  Coal mine equipment, 10 per cent.

(d)  Other tangible personal property except live stock and poultry, 15 per cent.

No other changes or raises were made. With these increases, the total assessment as of July 1, 1924, came to $17,787,618.00, as compared to the assessment of this county as of July 1, 1923, for 1924 taxes, of $19,075,251.00, being a decrease of $1,287,633. Letcher county appealed from these raises made by the State Tax Commission to the Franklin circuit court, which affirmed the raises and dismissed the appeal. From this judgment of the Franklin circuit court this appeal is prosecuted.

The case presents pure questions of fact, there being two. First, is the assessment of the property of Letcher county as finally raised by the State Tax Commission greater than the fair market value of such property as of the date of its assessment; if not, then is such assessment equalized with that of the other counties of the state and particularly of those counties especially like unto it in character?

Letcher county is situated in the southeastern portion of this state, being one of the tier of counties which border on the state of Virginia. In shape it resembles somewhat a plowshare. In it are found the headwaters of the Big Sandy river, the north fork of the Kentucky river and Poor fork of Cumberland river. Running from southwest to northeast in the eastern part of the county is Pine mountain. The county is well underlaid with coal except in this Pine mountain area, which is known as the Pine mountain fault, and which is barren of minerals. The weight of the evidence establishes that there are approximately 212,000 acres in this county. The Pine moun-

tain fault comprises about 25,000 acres, and there are about 100,000 acres of coal bearing land. There are two well defined seams of coal in this county, one known as the Elkhorn seam, a very fine by-product coal which averages in thickness about 72 inches; the other known as the Hazard fire clay seam, which averages about 46 inches in thickness, which is not near so valuable as the Elkhorn seam. The latter seam is confined to the northeastern section of the county, and is best where that county abuts on Pike county and the Pine mountain fault. There is another seam of coal on the Virginia side of the Pine mountain fault, but its area and size are not so material as to be of much importance in this litigation, although the coal is of very high grade, and its seams are quite thick. The L. & N. Railroad, following the North fork of the Kentucky river from west to east, splits the county approximately into half. When it almost reaches the eastern boundary of the county it turns and runs north by northeast until it gets in to the area known as "the Elkhorn seam." On the other side of the divide between the north fork of the Kentucky river and the headwaters of the Big Sandy river runs the Sandy Valley and Elkhorn Railroad, which also serves the Elkhorn seam area. It connects with the C. & O. Railroad that follows the Big Sandy river to Ashland, Ky. There are numerous switch and branch lines running off from these railroads up creek hollows to several developments near the main lines. However, on account of the attitude of the Inter-state Commerce Commission, which has authority under the Transportation Act of 1920 to disapprove of further extensions of railroads, it is not probable that any material extension of railroads will be made in this county for some time to come, as the bituminous coal production of this county at present is far in excess of the demand. It therefore results that the large areas of undeveloped coal property found in this county can not and will not be exploited for many years to come.

The first class of property on which the state tax commission placed an increase is: "Lands, coal, timber and improvements owned in fee." Letcher is a one-crop county and that crop is coal. So we are confronted at the outset with the question of valuation of surface and underlying coal owned jointly in fee. This question disposed of, the remaining one of the valuation of surface ownership, divorced from the ownership of the underly-

ing coal, will not disturb us much. In order to properly approach the question of valuations of surface and underlying coal owned jointly in fee, we must keep in mind that the Elkhorn seam, which is the best seam in this county and perhaps in the state, is almost entirely owned in fee in conjunction with surface ownership. It lies in a very compact area and is owned by a very few companies, the biggest of them being in order of their size, the Consolidation Coal Company and the Elkhorn Coal Corporation. These companies own almost all of the Elkhorn seam and their holdings are large and compact. The Hazard or fire clay seam which covers the rest and by far the major portion of the county is in the main owned by others than those who own the surface, their ownership being designated in the tax schedules as "coal rights" on which the state tax commission put no increase in assessment. It will thus be seen that, apart from surface ownership as such, the raise on "lands, coal, timber and improvements owned in fee" made by the state tax commission fell almost entirely on the Elkhorn seam area. Where it did not, and where it fell on the Hazard fire clay seam area, the state tax commission frankly admits that the raise is not justified. But those so affected are few in number and have their remedy by an appeal to the Letcher quarterly court. The record shows that such appeals are pending in a number of cases, and the state tax commission avers that it will see to it that relief is granted in such cases so as to equalize these assessments with the market value of the property and the assessment of other property in this county and state. Returning to the Elkhorn seam, we have then to determine whether or not it is assessed at a value greater than its market value and unequally with regard to other property in the county and state. A great mass of testimony has been taken on both sides to substantiate the position of the parties *pro* and *con*. The various taxing authorities are somewhat hampered in arriving at a correct valuation of the coal properties and real estate in Letcher county because of the peculiar conditions existing there. The agriculture of the county does not amount to much. The river bottoms are not wide, as these streams find their sources in this county. On the other hand, the hills are more rounded and the river gorges are less deep than in the lower river counties where the streams swollen by their branches become larger and more powerful. Most of the timber has been

removed. So there is not much trafficking in land for agricultural or lumber purposes. The coal bearing area of the county has been about all bought up by a few big companies which make no sales of any of their property and only now and then buy in an adjoining piece when they can get it more or less at their own terms and which they buy solely for the purpose of rounding out their holdings. It results that we are not aided materially in the determination of market values by the transfer values of lands in this county. To supply this deficiency, the appellant brings forth the theory designated as "the present worth plan," which, in substance, is the present worth of the royalties which the owner of coal property might expect to receive over the period of years necessary to exhaust the coal in the land he owns. Necessarily this theory embraces the factors of the number of years necessary to exhaust the land, the rate of interest at which the present worth shall be calculated and the rate of royalty per ton that must be paid. This last factor, as we shall presently see, itself involves certain others. Appellant, strongly insisting on this theory to substantiate its case, has adopted a uniform royalty of ten cents per ton, a period of years numbering fifty for developed areas and a rate of interest varying from six to ten per cent. In a somewhat analogous attempt to find a formula whereby to estimate the present worth of future pecuniary benefits reasonably to be expected by dependents from an employee killed by the negligence of a carrier engaged in interstate commerce under the Federal Employers' Liability Act, Justice Brandeis, in the case of Louisville & Nashville R. R. Co. v. Holloway, 246 U. S. 525, 38 Sup. Ct. Rep. 379, pointed out the error of a rigid mathematical limitation of the legal rate of interest and the period involved in the estimate. However, the adoption of such basis for these factors utterly ignores the economic laws of "margin of cultivation" and "diminishing returns." It is indisputably shown that the Elkhorn seam of 72 inches is worth far more per inch than the Hazard fire clay seam of only 46 inches, and that although it is true that on account of the faulty roof and faulty floor conditions in the Elkhorn seam some of this coal must be left for roofing and supporting purposes, and that although it also is true there is at times some parting in this coal, yet on the whole it is by reason of its size easier to work and makes larger financial returns per inch than the smaller Hazard fire clay seam. That the economic law of "mar-

gin of cultivation'' is working here is amply proved by the fact that when the economic depression in coal occurred in 1924, it was the smaller seam of coal on ''the margin of cultivation'' which had to be abandoned and it was the Elkhorn seam which continued to be mined. The fallacy of appellants' position is further demonstrated by the other economic law of ''diminishing returns,'' for the witnesses also testify that after passing five or six feet in thickness, a seam will not return profits proportionately as it increases in size. If the seams then do not vary in value in arithmetical proportion as they increase in size, it is apparent that the application of a uniform royalty will not actually reflect the true value of these seams as compared to each other, and if correct as to one must necessarily be incorrect as to the other. Again it is shown that the factor of fifty years is not a correct one, because by adopting such a period we reach, after passing the thirty-fifth year, a value for these lands less than that at which they are actually being dealt in. This is strikingly shown when this theory is applied to the undeveloped coal areas. Here, the witnesses say, development cannot be expected short of fifty years. It may be said in passing, however, that this expression of opinion on their part does not take into consideration that the demand for bituminous coal in this country may not only come up and equal the present oversupply but may also pass it and thereby again stimulate the supply so as to bring into development much sooner than the predicted fifty years these undeveloped coal lands. However, taking these factors as assumed these witnesses place a value on the undeveloped coal lands which, as stated by their own examining counsel, ''sounds like a quotation in German marks,'' whereas and in truth these very lands were at the time of this assessment and are now being traded in at a very substantial figure. We do not mean by this that the present worth plan should be disregarded. On the contrary, in the absence at least of reliable and available transfer values, it should be taken into consideration, but it cannot be adopted as the Procrustean measure of assessment values.

It would stretch this opinion to inordinate length and serve no good purpose to set out in full the evidence on both or either side bearing on this question of the fair market value of any of the property involved in this suit. Suffice it to say that although there was an economic depression in the coal industry in 1924, that many mines

were suspending or shutting down and that those who were running were in the main running in order to hold their organizations together and to preserve their coal properties, yet those companies which were hardest hit were operating in the area of the Hazard fire clay seam which on the whole was not affected by the raise in assessment imposed by the state tax commission, and those companies which operated in that area which is affected by such raise not only kept on operating but also seem to have increased their production, for Letcher county showed a 10% increase for that year. If these latter companies made no money in the year 1924, it cannot be for that reason alone that their property has vanished to nothing in value, because many companies and especially those in the mining industry measure their profits and gains and the value of the properties not by the results of any particular year but rather by those of a period of years. No complaint of any materiality has been made and none is involved in this case with reference to the values fixed on the "coal rights" in this county which are practically confined to the Hazard fire clay seam. It is true that some of the witnesses for appellant say that even these coal rights are assessed too high. But giving due weight to this testimony and even mentally reducing the value to be placed on such coal rights, yet when we have done so and compare their values with those of the coal owned in fee in conjunction with surface ownership, remembering that the former are confined in the main to the Hazard fire clay seam of 46 inches average thickness and the latter to the Elkhorn seam of 72 inches average thickness, and further remembering that the evidence overwhelmingly establishes that the relative difference in value between these two seams is not less than two times and runs as high in the estimation of some witnesses as three and four times, we cannot say that the increase of 5% placed on these coal lands owned in fee raises their value beyond their fair market value, nor beyond a value equalized with the assessed values of other coal properties whether owned by lease or as a coal right.

So far as surface lands *per se* are concerned, it must be remembered at the outset that by reason of the county assessor lumping the town lots of the larger towns of McRoberts, Jenkins, Fleming, Dunham and probably others in with the acreage property of the county on the tax schedules, a slightly higher average of value per

acre is obtained than would have been had the acreage values alone been separated from that of the town lots. When we do separate these values we arrive at a figure for acreage property alone of between $9.00 and $10.00 per acre. With the 5% increase put on by the state tax commission the maximum average is $10.50 per acre. Of course this does not mean that every acre in the county is assessed at this figure. It is true that some of the acreage in the Pine mountain fault is practically worthless, although we may call attention to the fact that the county assessor who appeared as a witness for the appellant in this action said that he knew of no transfer values in this area at less than $15.00 per acre. On the other hand, it is shown that the river bottoms and some of the more rounded hills run as high as $30.00 to $50.00 an acre in transfer value, and even in the opinion value of the witnesses. So we conclude that the average value on the surface even as raised by the state tax commission is not beyond its fair market value. By a like analysis of the evidence we arrive at the same conclusion concerning timber values and those of improvements owned in fee.

Passing to the 10% increase placed on coal leases and coal mine equipment, the evidence satisfactorily shows that their assessment as raised does not exceed their fair market value. Of course as to some items comprised in the ''mine equipment'' group there are some discrepancies and seemingly overassessment, but there is a remedy for this by appeal to the quarterly court. Further, exactitude is not to be expected in tax matters. That is a Utopia which has never been and probably never will be reached.

As to ''tangible personal property'' on which a 15% increase was placed appellants' chief complaint is that thereby household furniture and merchandise inventories are assessed way beyond their fair market value. As to household furniture, the position of the appellant is well taken. The evidence overwhelmingly shows that the average market value per room of household furniture in the mountain cabins and miners' homes of this county did not exceed $20.00 or $30.00 per room, whereas it was assessed at not less than $75.00 per room, and with the increase of 15% ran over $80.00 per room. However, it is further shown in this evidence that the total amount of tax exemptions allowed in this county is far in excess of the total assessed value of household furniture even as re-

vised. Tax exemptions are first applied to assessments of household furniture. It can matter little therefore to the taxpayer whether his furniture be assessed at $20.00 per room or $80.00 per room, providing his total assessment does not exceed his exemption. It is urged in opposition to this, however, that if the exemption allowed by statute is not exhausted by the assessment for household furniture, it may then be applied to other items of taxable property. But this is a practical world and we must deal with tax matters in a practical way. It is a very rare occurrence that any person whose exemptions are not exhausted by the assessment for their household furniture has any other property of consequence to which the excess exemption may be applied.

So far as the merchandise inventories are concerned, appellant produces a number of witnesses who say that in their judgment none of the stock of goods held by the merchants in this county on July 1, 1924, would have brought 50% of their inventory value at which they were assessed before the 15% raise was put upon them by the state tax commission. It is obvious though in reading their testimony that they do not have in mind the standard set up by the statute to measure fair market value, which is a sale where one is not compelled to sell and a purchase where one is not compelled to purchase. The sales they had in mind were sales made under more or less compulsion. The real voluntary sales referred to by them brought the cost price of the merchandise and better. We therefore conclude that the first question whether or not the assessment of Letcher county as finally raised by the state tax commission exceeded in value the fair market value of the property therein must be answered in the negative.

We are next confronted with the second question, whether or not the final assessment of Letcher county was equalized with that of the other counties of the state, and particularly with that of those counties especially like unto it in character.

These latter counties adjoin Letcher county and are three in number, being Perry, Pike and Harlan. The area of Perry county is, according to the consensus of opinion, 214,400 acres, of which the acreage of workable coal is 100,000 acres. The area of Harlan county is 275,000 acres, of which 100,000 acres is in workable coal. Pike county has an area of 505,280 acres, with an acre-

age of workable coal of 250,000 acres. We thus see that Letcher, Perry and Harlan have about an equal acreage of workable coal; that Letcher and Perry are about the same size; that Harlan is somewhat larger than either of them; that Pike county is about two and a half times as large and that it has about two and a half times as much workable coal. In Harlan county the major production of coal is from the Harlan seam, which averages about 45 inches in thickness. The next best seam is the Kellioka, which runs about 54 inches in thickness. These two seams comprise over 80% of the production of that county. About 15% of its production is in the Wallin seam, which runs about 70 inches in thickness. On the whole, however, the Harlan county production lies in those seams which are comparable in thickness with the Hazard fire clay seam of Letcher county. In Perry the three seams worked are known as No. 4, No. 6 and No. 7, averaging, respectively, 40, 50 and 54 inches in thickness, the No. 4 seam producing 80 per cent of the coal. In Pike county the seams run from 42 to 50 inches in thickness. In times of economic depression, the Perry field is like the fire clay field in Letcher county, and suffers first and more severely than the Elkhorn seam or seams of greater thickness than that of the fire clay seam. Its coal lands will, therefore, naturally carry a less value per acre than those of Letcher. On the other hand, the coal mines of Harlan, which seem to have continued to operate even in periods of coal depression, no doubt because they were largely owned by industries who used the product in their manufacturing, such as the Fordson Coal Company, Wisconsin Steel Company and others, carry a value equal to and greater than that of the Letcher field. In comparing the assessments of these counties with that of Letcher it must be remembered that Letcher county alone has made an intelligent effort to zone the various coal bearing areas in its boundaries and to estimate the actual amount of acreage that is underlaid with coal. When an assessment in Letcher county is placed on a boundary of land the value of the coal is arrived at by dividing the assessment by only that portion of the boundary which is underlaid with coal. Under this method, the coal would naturally bear a higher value per acre than it would if the assessment were divided by the total number of acres in the boundary. The latter seems to be the method in Harlan, Perry and Pike. Giving weight to this differential, we find that these counties

were assessed as of July 1, 1924, upon their coal values as follows:

|  | Assessment | Acres | Seams | Value |
|---|---|---|---|---|
| Perry | $3,175,816.00 | 100,000 | 42" | $32.00 |
| Pike | 10,241,437.00 | 250,000 | 45" | 41.00 |
| Letcher | 5,467,739.00 | 100,000 | 57" | 55.00 |
| Harlan | 6,466,235.00 | 100,000 | 49" | 65.00 |

If we take the total fee values in these counties which include those lands underlaid with coal as well as those barren we find the following:

|  | Assessment | Acres | Value |
|---|---|---|---|
| Perry | $7,055,186.00 | 214,400 | $33.00 |
| Pike | 18,223,436.00 | 498,560 | 36.00 |
| Letcher | 10,563,443.00 | 212,577 | 55.00 |
| Harlan | 13,699,752.00 | 275,000 | 62.00 |

The comparative total assessments of these counties for the past four years are:

| | |
|---|---|
| Letcher county assessment, 1923 | $19,075,251.00 |
| Letcher county assessment, 1924 | 17,787,618.00 |
| Decrease | $1,287,633.00 |
| Pike county assessment, 1923 | $31,155,000.00 |
| Pike county assessment, 1924 | 31,246,795.00 |
| Increase | $91,795.00 |
| Perry county assessment, 1923 | $19,471,353.00 |
| Perry county assessment, 1924 | 17,520,404.00 |
| Decrease | $1,950,949.00 |
| Harlan county assessment, 1923 | $24,871,843.00 |
| Harlan county assessment, 1924 | 26,492,537.00 |
| Increase | $1,620,694.00 |

The coal production for 1924 of these four counties was:

| | |
|---|---|
| Letcher | 4,851,806 tons |
| Pike | 6,049,809 tons |
| Perry | 5,229,006 tons |
| Harlan | 9,076,269 tons |

The production of these four counties aggregated about 60% of the coal production in Kentucky. The

value of the Letcher county coal averaged $2.87 a ton; that of the Harlan county coal, $2.74 a ton; that of the Pike county coal, $2.59 a ton; and that of the Perry county coal, $2.52 a ton. A careful weighing of this evidence convinces us that, as far as is humanly possible, these four counties have been assessed on an equal basis. At least Letcher county has no cause to complain because when compared to Harlan county, to which it is most like in the quality of coal produced, in the tonnage mined, in total area and in area of coal bearing fields, it has a relatively less assessment per acre than its neighbor, although its best coal from which its largest tonnage is produced comes from a thicker and hence more easily and profitably worked seam and commands a higher price. It is urged as against these considerations that Letcher county is so remote and carries a freight differential which places it at a disadvantage in competing with these other fields. There is a freight differential of 10 cents per ton on coal consigned to Kentucky points and to the Cincinnati gateway; also a high differential on southern consignments and a relatively heavy tidewater differential. But in that market where the Letcher county coal is sold, which is beyond and to the north of the Ohio gateways and around the lakes, there is no differential against Letcher county. That the differentials which do exist have not hampered the coal production of Letcher county is obvious from the fact that not only does its coal bring a higher price per ton in the market than that of its competing neighbors, but also the rate of increase of its production was and is much greater than that of Harlan, Perry or Pike. From the foregoing figures and considerations, it is apparent that these four counties have been equalized in their assessments as of the assessing date in question.

The evidence as to whether or not these counties were equalized in their assessment as of July 1, 1924, with the other counties in the state is meagre, and necessarily so, because very few if any of the other 116 counties are like them in character. But, not to draw this opinion out beyond its already great length, we are convinced that as far as could humanly and practically be done, these counties were assessed on an equal basis with the other counties of the state, considering their difference in kind and character. We therefore conclude that the second question must be answered in the affirmative.

It thus appearing that the Franklin circuit court committed no error in dismissing appellant's appeal its judgment is affirmed.